## ORDER

## In Re: D.M.

*D. Douglas Keegan,* for juvenile.
*John Fuller,* for child welfare services.

THOMAS, *P.J.*, January 23, 1981 — We write this brief opinion for the enlightenment of the Superior Court in deciding an appeal from a juvenile court order.

## PROCEDURAL BACKGROUND

This case came before the juvenile court initially in November of 1979 on a petition by the public school attendance officer alleging a wilful and deliberate violation of compulsory school attendance by 16 year old D.M. It was alleged she had missed 84 of 96 days of school in the 1977-78 school year and 85½ of 109 days in the 1978-79 school year. The petition also addressed itself to D.M.'s reclusive conduct, temper tantrums, suicidal tendencies and hostile and assaultive behavior toward her mother. A dependency adjudication was requested for this admittedly slightly mentally retarded juvenile.

At the hearing on Novenber 28, 1979, the juvenile court judge had the benefit of extensive school, social and psychological reports dating back to 1970.

D.M. has an IQ in the 60's to low 70 range, and learning ranges equivalent to grades 1.5 to 2.6 and was a participant in the school's specially designed program (S.E.D. Program) for the educable mentally retarded. D.M. simply refused to go to school. D.M. had been in special education programs throughout most of her educable life and one medical report diagnosed her a cerebral palsy spastic. She is an outwardly attractive girl with no noticable physical impairments and is reasonably conversant. We heard the working mother's exasperation with efforts to convince D.M. to attend school.

After hearing, we concluded that while being mentally retarded, D.M. was also capable of manipulating and threatening her Child Welfare

caseworker and mother into allowing her to have her own way and do nothing to attain a rudimentary education in an atmosphere that would also enhance her social skills. Accordingly, we adjudicated her dependent and directed her to immediately re-enroll in the special S.E.D. classes at the Senior High School and attend classes and special programming every day. All witnesses, lay and professional, were of the opinion that a specially designed education program and routine contact with the public and other school students were in D.M.'s best interest. We "called her bluff" of adamant refusal to go to school by authorizing Child Welfare Services to use physical force to deliver her to school if necessary. We also directed exploration of alternative or augmenting programs.

After this order, D.M. voluntarily returned to school and had near perfect attendance for a period of time and according to teacher's reports, was cooperative and progressing satisfactorily.

In the late spring of 1980, D.M. began missing school again and mother and D.M. expressed little or no interest in proposed alternative programs. The focus of attention for D.M. and mother became D.M.'s upcoming 17th birthday on September 24, 1980. Both mother and D.M. verbalized this date as the long sought event that would allow D.M. to quit school and thus get the school, child welfare services and juvenile court out of their lives.

On July 17, 1980, the court was advised by child welfare services that mother had advised them that she and D.M. were uninterested in contact with the Bureau of Vocational Rehabililtation or an excellent local program for the mentally retarded, Vallonia Industries.

Mother had advised child welfare services that "she would be so happy when D.M. attains 17 years and can quit school." Child Welfare's inquiry to the court was whether the court felt its court ordered school attendance superseded the compulsory attendance laws so that D.M. could not voluntarily quit school on her 17th birthday. We informally opined that D.M. could *not* quit school in violation of our juvenile court order and if D.M. and mother wished to convince the court that it would be in the child's best interest to quit school, we would accord them a hearing to do so. Mother retained Northwest Legal Services to pursue this suggestion and a review hearing was scheduled for September 30, 1980. This hearing was continued to October 30, 1980, with a notation the court would consider any proposed alternative program to school that would assure the social and educational development of this mentally retarded child. In the meantime, D.M. continued in school with a specially devised program consisting of limited educational class time for half the school day and then a "work experience" program for the other half of the day which had D.M. working at a local pet shop greeting customers, feeding and caring for the pets and doing limited menial tasks.

At the hearing, we incorporated many of the past psychological reports and reports to the court lodged in the court's file as part of the record by agreement of D.M.'s counsel.* We then heard from D.M.'s teacher, the assistant school principal, who was the former attendance officer who has dealt with D.M. for a number of years, the school

---

*Attached to hearing transcript as a supplement thereto.

psychologist, present school attendance officer, D.M., L.M., mother of D.M., and a 34 year old friend of the family.

We see no need to discuss in any detail the testimony produced. Our clear conclusion was that D.M. was progressing as satisfactorily as could be expected with her limited mental capacity and in spite of her verbalized dislike of school to mother, she was being educated within her limitations and acquiring social skills necessary to cope with meaningful living standards in her future. Her teacher said D.M. was no discipline problem and seemed to enjoy school. The alternative plan proposed by the mother, a personal public school tutor sent to the home each day so D.M. wouldn't have to leave home to go to school, was impractical and impossible of fulfillment.

In summary, this court concluded that allowing D.M. to quit school and the special programs designed for her which seemed to be successful, would invite regression and a return to reclusiveness, lack of meaningful peer socialization and mother-daughter conflict. On October 30, 1980, we entered an order continuing D.M. under juvenile court jurisdiction in a dependency adjudication and directed continued school attendance in the specially designed program offering part-time work. We specifically refused her request to withdraw from school and scheduled a review of the case in June of 1981.

## ISSUES

The sole issues are:

1. Did the juvenile court abuse its discretion?

2. May the juvenile court, having jurisdiction of a juvenile, require the juvenile to continue in a

public school program beyond the juvenile's 17th birthday and against the wishes of the juvenile and her parent?

## DISCUSSION

Our brief research finds no cases directly in point. We feel the following sections of the Juvenile Act contain sufficient language when coupled with the inherent power of the Juvenile Court to act in the best interest of the juvenile to justify the order entered in this case:

42 Pa.C.S.A. §6301(b)

"Purposes.—This chapter shall be interpreted and construed as to effectuate the following purposes: (1) . . . to provide for the care, protection and wholesome mental and physical development of children . . ."

42 Pa.C.S.A. §6302

"'Dependent child.' "A child who: . . . (5) while subject to compulsory school attendance is habitually and without justification truant from school; (6) has committed a specific act or acts of habitual disobedience of the reasonable and lawful commands of his parent . . . and who is ungovernable and found to be in need of care, treatment or supervision . . ."

42 Pa.C.S.A. §6351—Disposition of dependent child

"(a) General rule.—If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the protection and physicial, mental and moral welfare of the child: (1) Permit the child to remain with his parents . . . subject to conditions and limitations as

the court prescribes, including supervision as directed by the court for the protection of the child."

The requirement of continuing education and a program designed to teach social skills is particularly compelling when the child is mentally retarded. The compulsory school attendance laws, Public School Code of March 10, 1949, P.L. 30, as amended, 24 P.S. §§13-1326, 1327, permit withdrawal from the public school system at age 17. A juvenile court has the power to require school attendance as being in the best interest of the juvenile as part of a juvenile court order and this prerogative supersedes the statutory right accorded a juvenile *not* under court supervision to voluntarily withdraw from school. The court's decision is amplified by common sense, expert testimony and a realization that the mother's position is reflective of a desire to placate the child's wishes of not attending school rather than adherence to a program in the child's best interest.

We reaffirm our order previously entered October 30, 1980.